### III. Summary of Comments Received

During the most recent comment period, which closed on April 4, 1994, timely comments were received from 31 sources, including nine individuals, nine organizations, four state court judges, one federal court judge, five U.S. Attorney's Offices, two Department of Justice components, and one other federal agency. Of the 31 comments received, nine comments supported promulgation of the proposed rule, 20 comments opposed the rule, and two other comments failed to take any definitive position on the proposed rule as a whole. As with previous versions of this rule, many writing in opposition to the Department's proposal argued that it unfairly permits the Department to hold its attorneys to ethical rules different from those that apply to all other attorneys. Other opponents of the proposed rule—most notably the ABA and a special committee of the Conference of State Supreme Court Chief Justices—challenged the proposed rule on constitutional and statutory grounds, arguing that the Department lacks authority to preempt state ethics rules or to supersede local federal district court rules. Those writing in support of the proposal generally praised it for bringing certainty and clear guidance to an area that previously has been unclear and disruptive of law enforcement functions.

The Department has considered carefully each comment and appreciates the thoughtfulness reflected in them. The Department's responses to those comments are discussed below, either in the "General Comments" section or in the context of the particular section or paragraph to which they pertain as part of the "Section-by-Section" analysis. All revisions adopted in the final rule are indicated.

### IV. General Comments

Comments were received on the following three general issues: (1) the need for the rule; (2) the constitutional and statutory authority for the rule; and (3) the sufficiency of the rule's internal enforcement mechanisms. These general comments essentially repeated comments received in response to previous versions of the proposed rule. After careful reconsideration of these recurring issues, the Department's position on many of these subjects—in particular, the constitutional and statutory basis for this rule and the need for and advisability of such a rule—remains the same. Therefore, the Department's response in this section builds upon responses published in previous commentaries.

A. *The Need for the Rule.* One state court judge, one federal judge, five individuals, and six organizations criticized the proposed rule as holding government attorneys to lower ethical standards than those that apply to all other attorneys. This comment was formulated in a variety of ways, with the following as illustrative examples: "[t]he rules apply to everyone, and it should especially apply to attorneys in Government service;" "I do not know why it is that the department somehow thinks [it] can exempt [its] attorneys from the rules of conduct that all of the lawyers must abide by;" "[Department] lawyers should be treated as subject to the same rule of law that applies to the conduct of all other lawyers;" and "[f]airness simply will not tolerate exalting the role of one adversary's advocate above the other."

In response to these comments, the Department finds it important, first, to make clear that this rule is not designed to diminish the ethical responsibilities of government attorneys; it is intended to clarify those responsibilities. The current situation, in which state contact rules purport to govern the substantive conduct of federal law enforcement attorneys, has proven unsatisfactory because the standards of ethical conduct are uncertain and subject to unpredictable and varying interpretations. This uncertainty as to what constitutes appropriate conduct by Department attorneys has interfered with the responsible exercise of the law enforcement duties of Department attorneys. The basic purpose of this regulation is to provide a uniform rule of ethics regarding contacts with represented persons that can be consistently and predictably applied. By doing so, the regulation will allow all Department attorneys involved in a federal law enforcement proceeding to understand and abide by applicable standards. There is simply no basis for believing that there will be a reduction in compliance with ethical standards by federal prosecutors.

Many commenters opposing the proposed rule dismissed as unnecessary the creation of a uniform set of rules for Department attorneys. Some commented that the *ex parte* contact rules currently in place do not vary significantly, given that virtually every jurisdiction has adopted some version of the ABA's anti-contact rule. Other commenters argued that, in any event, state and local ethics rules do not interfere substantially with federal law enforcement activities because only in rare instances have federal prosecutors actually been investigated by a state disciplinary authority.

Although an anti-contact rule is in effect in nearly all jurisdictions, it is not interpreted uniformly. Among other things, jurisdictions differ as to whether the anti-contact rule applies in the investigatory stage, *compare United States v. Ryans*, 903 F.2d 731, 739 (10th Cir.), *cert. denied*, 498 U.S. 855 (1990) *with United States v. Hammad*, 858 F.2d 834, 839 (2d Cir. 1988), *cert. denied*, 498 U.S. 871 (1990); whether the rule applies to prosecutors, *compare Matter of Doe*, 801 F. Supp. 478 (D.N.M. 1992) *with* District of Columbia Rules of Professional Conduct Rule 4.2 cmt. ¶ 8; whether the rule applies to former employees of a represented corporate party, *compare Public Serv. Elec. & Gas v. Associated Elec. & Gas*, 745 F. Supp. 1037, 1042 (D.N.J. 1990) *with Polycast Technology Corp. v. Uniroyal, Inc.*, 129 F.R.D. 621, 628 (S.D.N.Y. 1990); and whether the rule applies to all corporate employees who could make admissions on behalf of the corporation or only to employees who belong to a so-called "control group." *Compare* Model Rules of Professional Conduct Rule 4.2 cmt. (1983) *with Wright by. Wright v. Group Health Hosp.*, 691 P.2d 564 (Wash. 1984). The lack of uniformity in interpreting existing anti-contact rules has created concern among government attorneys of inadvertently running afoul of state court or federal district court rules. The threat of disciplinary proceedings (and the possible resulting loss of license and livelihood) against a government attorney engaged in legitimate law enforcement activities has had a chilling effect on the responsible exercise of law enforcement duties. Many federal prosecutors who submitted comments in connection with the earlier versions of this rule stated that they feel compelled to refrain from authorizing or participating in legitimate and ethical law enforcement activities because of the current uncertainty as to the acceptability of various *ex parte* contacts.

To add to the confusion inherent in the current situation, the Department's attorney staff consists of members of many different state bars who commonly appear in multiple jurisdictions. Under the Model Rule's approach, an attorney practicing in a jurisdiction in which he or she is not a member of the bar remains subject to the jurisdiction of the bar of which he or she is a member, but if the rules in the two places differ, principles of conflict of laws may apply. Model Rules of Professional Conduct Rule 8.5 and cmt. (1983). As a result, when state anti-contact rules purport to govern the conduct of federal attorneys, the

question of which rule governs the conduct of Department lawyers may often be complicated. Indeed, as was noted in the "Background" section of this commentary, government attorneys may be subject to substantially different rules when they are working alongside one another on the same case. One commenter proposed that instead of issuing a uniform contacts rule for Department attorneys, the Department should encourage its attorneys to practice only in a given jurisdiction and to obtain bar membership in that jurisdiction. However, Congress has made clear that Department attorneys should be able to practice in different jurisdictions so long as they are a member of some state bar, and there is a significant federal interest in preserving the Department's ability to assign its attorneys wherever there are law enforcement needs to be met. This uniform rule regarding contacts with represented persons achieves consistency and high ethical standards without hampering federal law enforcement activity.

In formulating this uniform rule, the Department has not disregarded existing state ethics rules, as a number of comments imply. As set forth in section 77.12, this regulation is specifically intended to fit within the structure of DR 7-104 and Model Rule 4.2, as well as analogous state and local district court disciplinary rules. Both DR 7-104 and Model Rule 4.2 provide that communications that are "authorized by law" are exempted from the general prohibition of the rule and, according to the Reporter for the commission that developed the Model Rules, Yale Law School ethics professor Geoffrey Hazard, this exception was drafted with the "government lawyer" problem in mind. See Letter of January 19, 1994 from Professor Geoffrey C. Hazard, Jr. to Chief Justice E. Norman Veasey, at 2 ("I can state from first-hand knowledge that this [authorized by law] qualification was drafted mindful of the government lawyer problem, among others. In my opinion it is within the authority of the federal government, particularly the Justice Department, to promulgate such regulations.") (This letter and all comments are on file with the Office of the Associate Attorney General, United States Department of Justice). As explained later in this commentary, the Department's position is that communications with represented persons undertaken pursuant to this duly promulgated regulation clearly constitute communications "authorized by law." Therefore, in nearly all jurisdictions, communications approved under the Department's rules will be appropriate under existing ethical rules as well.

Furthermore, the content of this rule derives largely from DR 7-104 and Model Rule 4.2 and is wholly consistent with the principles underlying these rules. This regulation grants greater latitude for lawyer communications with a represented "person" during the investigative phase of law enforcement than with a represented "party" after adversarial proceedings have commenced. This distinction appears in the texts of DR 7-104 and Model Rule 4.2, which prohibit only communications with "a party" the lawyer knows to be represented by another lawyer in the matter. This distinction also accords with the great weight of federal court interpretations of the state ethics rules. See Ryans, 903 F.2d at 739 ("We are not convinced that the language of [the anti-contact rule] calls for its application to the investigative phase of law enforcement" because "the rule appears to contemplate an adversarial relationship between litigants, whether in a criminal or a civil setting"); United States v. Sutton, 801 F.2d 1346, 1365-66 (D.C. Cir. 1986) (anti-contact rule "was never meant to apply to [pre-indictment, non-custodial] situations such as this one"); United States v. Dobbs, 711 F.2d 84, 86 (8th Cir. 1983) (agent's "noncustodial interview of [suspect] prior to the initiation of judicial proceedings against the appellant did not constitute an ethical breach"); United States v. Fitterer, 710 F.2d 1328, 1333 (8th Cir.) (anti-contact rule does not prohibit prosecutors from using undercover informants to communicate with represented persons prior to indictment), cert. denied, 464 U.S. 852 (1983); United States v. Jamil, 707 F.2d 638 (2d Cir. 1983) (prosecutor's use of undercover informant in pre-indictment, non-custodial setting to communicate with represented person does not violate DR 7-104); United States v. Vasquez, 675 F.2d 16, 17 (2d Cir. 1982) (anti-contact rule was not intended to prohibit use of undercover informants prior to indictment); United States v. Kenny, 645 F.2d 1323, 1339 (9th Cir.) ("the government's use of such investigative techniques at this stage of a criminal matter does not implicate the sorts of ethical problems addressed by the Code"), cert. denied, 452 U.S. 920 (1981); United States v. Weiss, 599 F.2d 730, 739-40 (5th Cir. 1979) (prosecutor's investigatory communications upheld against challenge under anti-contact rule); United States v. Lemonakis, 485 F.2d 941, 953-56 (D.C. Cir. 1973) (anti-contact rule does not apply prior to indictment, and use of undercover informant did not violate rule in any event), cert. denied, 415 U.S. 989 (1974); In re U.S. Dept. of Justice Antitrust Investigation, 1992-2 Trade Cases (CCH) ¶ 69,933, at 68,469 (D. Minn. 1992) (Minnesota's Rule 4.2 held inapplicable because "[t]he word 'parties' in Rule 4.2 indicates the presence of a lawsuit" and "[t]he present controversy relates to an investigation, not a lawsuit"); United States v. Infelise, 773 F. Supp. 93, 95 n.3 (N.D. Ill. 1991) (DR 7-104(A)(1) "speaks in terms of communications with a 'party', suggesting that the rule is to be applied only when adversarial proceedings have been initiated"); United States v. Western Electric Co., 1990-2 Trade Cases (CCH) ¶ 69,148, at 64,314 & n.6 (D.D.C. 1990); United States v. Buda, 718 F. Supp. 1094, 1096 (W.D.N.Y. 1989); United States v. Chestman, 704 F. Supp. 451, 454 (S.D.N.Y. 1989), rev'd on other grounds, 903 F.2d 75 (2d Cir. 1990), aff'd in part, 947 F.2d 551 (2d Cir. 1991) (en banc); United States v. Galanis, 685 F. Supp. 901, 903-04 (S.D.N.Y. 1988); United States v. Guerrerio, 675 F. Supp. 1430, 1438 (S.D.N.Y. 1987). But see United States v. Hammad, 858 F.2d 834, 839 (2d Cir. 1988) (pre-indictment communications may be improper if accompanied by "misconduct" on the part of the government), cert. denied, 498 U.S. 871 (1990); United States v. Pinto, 850 F.2d 927, 935 (2d Cir.), cert. denied, 488 U.S. 867 (1988); United States v. Sam Goody, Inc., 518 F. Supp. 1223, 1224-25 n.3 (E.D.N.Y. 1981), appeal dismissed, 675 F.2d 17 (2d Cir. 1982); see also Comment to ABA Model Rule 4.2 (notwithstanding use of the term "party," the rule does not require that a person be "a party to a formal legal proceeding").

The courts have readily recognized that Department attorneys engaged in criminal and civil law enforcement matters perform distinctly different functions from attorneys engaged in the private practice of law. The courts have further recognized that the rules governing communications with represented persons should take account of these differences. To disregard these differences would therefore impose substantial and deleterious restrictions on the legitimate law enforcement duties of Department attorneys that do not presently exist.

For much the same reasons, the Department believes that there is a basis for distinguishing for purposes of this regulation between Department attorneys engaged in law enforcement activities (who are covered by this regulation) and Department attorneys

engaged in civil suits in which the United States is not acting under its police or regulatory powers (who are not covered). One commenter proposed extending these rules to cover also the latter activities of Department attorneys; however, because government attorneys engaged in other, ordinary civil litigation are not engaged in distinctly different functions from private attorneys involved in civil cases, they are not brought under this regulation.

Two organizations further criticized the Department for holding government attorneys to ethical standards no higher than what the Constitution provides. The Department agrees that the constitutional baseline does not provide the proper measure of government attorneys' ethical obligations. But this regulation does not purport to equate the two standards. On the contrary, the Department's final rule imposes a range of restrictions that go beyond those that are constitutionally compelled. For example, the regulation prohibits government attorneys generally from engaging in negotiations of certain specified legal agreements with any represented individual without the consent of that individual's counsel, even if that individual is not in custody and not formally charged. Such communications are not constitutionally proscribed. *See* Brewer v. Williams, 430 U.S. 387, 398 (1979); Miranda v. Arizona, 384 U.S. 436 (1966). Additionally, the Department plans to issue United States Attorneys' Manual provisions that will place significant limits on the ability of government attorneys to engage in noncustodial communications with a represented "target" of a federal criminal or civil law enforcement investigation, even though narrowing an investigation to focus on a particular suspect does not trigger the suspect's right to counsel. *See* Hoffa v. United States, 385 U.S. 293 (1966). Therefore, in constructing these standards to guide the ethical conduct of its attorneys, the Department has imposed ethical restrictions on Department attorneys that extend significantly beyond what the Constitution requires.

B. *The Constitutional and Statutory Authority for the Rule.* 1. *The Department's Authority To Promulgate the Rule.* A number of commenters argued that the Attorney General lacks delegated authority to promulgate this regulation. Comments stressed that "[n]o act of Congress purports to authorize the Department to adopt regulations to override state ethics rules governing lawyers," and that the proposed regulation in fact is "contrary to . . . the explicit mandate of Congress" that every Department attorney must get a license from a State and maintain that license.

Rules governing the conduct of Department attorneys, or any other officials of the Executive Branch, may be promulgated only pursuant to constitutional or statutory authority. Congress's delegation of authority need not be specific or explicit. *Chrysler Corp.* v. *Brown*, 441 U.S. 281, 307–08 (1979). The Department believes that it possesses appropriate statutory authority to promulgate this regulation pursuant to two distinct sources: 5 U.S.C. 301 ("commonly referred to as the 'housekeeping statute,'" *Chrysler Corp.*, 441 U.S. at 309 (citation omitted)), and title 28 of the United States Code, which in a variety of provisions authorizes the Attorney General and the Department to enforce federal law and to regulate the conduct of Department attorneys.

Section 301 of title 5, United States Code, authorizes the Attorney General to "prescribe regulations for the government of [her] department," "the conduct of its employees," and "the distribution and performance of its business." 5 U.S.C. 301. The Supreme Court has held that this provision authorizes the Attorney General to issue regulations with extra-departmental effect. *See, e.g., Georgia* v. *United States*, 411 U.S. 526, 536 (1973) (holding that section 301 provided the Attorney General with "ample legislative authority" to issue regulations that established procedural and substantive standards binding on state and local governments); *United States ex rel. Touhy* v. *Ragen*, 340 U.S. 462 (1951) (federal government attorney could not be held in contempt for following an Attorney General regulation promulgated pursuant to a predecessor to section 301).

Title 28 of the United States Code grants the Attorney General and the Department a variety of law enforcement powers including the power (through intermediary officials) to conduct grand jury proceedings or any other kind of civil or criminal legal proceeding; to conduct litigation, and to "secur[e] evidence" therefor; to detect and prosecute crimes; and to prosecute "civil actions, suits, and proceedings in which the United States is concerned." 28 U.S.C. 515(a), 516, 533, 547; *see* 28 U.S.C. 509, 510. The Attorney General is also authorized to "supervise all litigation" to which the United States is a party and to direct United States Attorneys and other subordinate attorneys in the "discharge of their respective duties." 28 U.S.C. 519. These provisions grant the Attorney General extremely broad authority to supervise the enforcement of federal law.

In order for a Department regulation to have the force and effect of law, it must rest on a reasonable construction of the statutes delegating the authority to promulgate it and must not in substance contradict any act of Congress. *See, e.g., NLRB* v. *United Food and Commercial Workers Union, Local 23*, 484 U.S. 112, 123 (1987); *Capital Cities Cable, Inc.* v. *Crisp*, 467 U.S. 691, 699–700 (1989). These rules represent the reasoned judgment of the Attorney General and of the Department about the lawful authority of federal lawyers effectively to investigate and prosecute crimes.

One individual and a number of organizations, including the Conference of Chief Justices, posited that the Department is acting outside the scope of its congressionally delegated authority because this regulation assertedly contravenes the Department of Justice Appropriation Authorization Act of 1979, which requires all Department attorneys to be "duly licensed and authorized to practice as an attorney under the laws of a State, territory, or the District of Columbia." Pub. Law No. 96–132, § 3(a), 93 Stat. 1040, 1044 (Nov. 30, 1979), as carried forward by Pub. Law No. 103–121, 107 Stat. 1153, 1163 (Oct. 27, 1993) (reenacting provisions of Pub. Law No. 96–132). These commenters suggested that when Congress required Department attorneys to be licensed by a state bar, Congress implied that Department attorneys should be subject to all the rules and regulations of state authorities, regardless of their impact on officials carrying out federal law enforcement. Therefore, this regulation, by shielding Department attorneys from state disciplinary proceedings for violations of state rules interfering with effective federal law enforcement, is alleged to violate Congress's clear intent in enacting the Department's appropriation statute.

The Department believes that these comments mistake the purpose and effect of the congressional requirement that federal attorneys have state licenses. That requirement, which is satisfied by admission to the state's bar and maintenance of bar membership, simply serves to ensure that the professional qualifications of all Department lawyers have in fact been examined. No comment received by the Department demonstrates that Congress intended the requirement to have the further effect of interfering with the Attorney General's ability to ensure effective federal law enforcement or of compelling federal attorneys to comply

with state bar ethical standards that contradict federal rules.

2. *The Department's Power to Preempt State Ethics Rules.* One individual, one state court judge, and five organizations, including the Special Committee of the Conference of Chief Justices, commented that the Department does not have the constitutional power to preempt state regulation of its attorneys.

It should first be noted that in most instances the force and effect of these rules should not depend on whether they preempt state ethics rules under the Supremacy Clause. As already noted, communications within the scope of the regulation are intended to constitute communications that are "authorized by law" within the meaning of DR 7–104, Model Rule 4.2, and analogous disciplinary rules. Therefore, if the relevant state rule contains an authorized-by-law exception, this regulation should be seen as constituting such authorization, thereby bringing any attorney communication permissible under these rules in conformity with that state law and eliminating the Supremacy Clause issue.

The Committee of Chief Justices commented that it is the exclusive province of the state supreme courts to construe state disciplinary rules and to determine whether this regulation falls within the "authorized by law" exception to these rules. The Department has simply expressed its *intention* to fit communications made pursuant to these rules within the "authorized by law" exception to state and local federal court rules, and its *belief* that this regulation indeed constitutes legal authorization for such communications. The Department notes that it would seem to require a very strained reading to conclude that a regulation duly promulgated after notice and comment and within the scope of its delegated authority does not also constitute "law." *Cf. Chrysler Corp.*, 441 U.S. at 295–96 (1979) ("It has been established in a variety of contexts that properly promulgated substantive agency regulations have the 'force and effect of law.'... It would therefore take a clear showing of contrary legislative intent before the phrase 'authorized by law' in [18 U.S.C.] § 1905 could be held to have a narrower ambit than the traditional understanding." (citation omitted)).

However, the Department recognizes that situations may arise in which the power of this regulation to displace state rules will depend on its preemptive force under the Supremacy Clause. Such situations may arise in several forms: where the applicable ethics rule has no "authorized by law" exception; where this regulation is deemed not to constitute "law" for purposes of such exception; or where a communication is held to violate the applicable ethics rule and not be "authorized" by this regulation. Therefore, an important feature of this regulation is its express intention to preempt and supersede the operation of state and local federal court rules as they relate to contacts by Department attorneys, regardless of whether such rules are inconsistent or consistent with this regulation, absent a finding of a willful violation of these rules by the Attorney General.

The preemption of state regulation of contacts with represented persons, except when the Attorney General has found a willful violation of the federal regulation, was an integral feature of this rule as proposed earlier. The proposed rule reflected the Department's belief that preemption of state and local rules, which have been unevenly applied, is necessary to ensure that government attorneys' conduct respecting *ex parte* contacts is subject to uniform and predictable standards. The Department has made minor revisions to section 77.12 to clarify that the Department's intent is to displace even purportedly consistent state regulation in this area (or, as it is commonly phrased, to "occupy the field" of reviewing *ex parte* contacts by Department attorneys). The rules and this commentary now state in more express terms the Department's intention to preclude any state regulation of government attorneys respecting the subject matter of these rules, unless the Attorney General first finds a willful violation of these rules.

Several comments suggested that the Attorney General lacks the authority to preempt state disciplinary rules, absent an explicit Congressional authorization to do so. These comments misconceive the power of a federal agency or department to preempt state regulation. Congress may, of course, expressly preempt all state regulation in a particular field, *see Rice* v. *Sante Fe Elevator Corp.*, 331 U.S. 218, 247, 255 (1947); *accord Jones* v. *Rath Packing Co.*, 430 U.S. 519, 536–37 (1977), and, in proper circumstances, a federal agency similarly "may determine that its authority is exclusive and preempts any state efforts to regulate in the forbidden area." *City of New York* v. *FCC*, 486 U.S. 57, 64 (1988). *See generally Fidelity Federal Sav. & Loan Ass'n* v. *De La Cuesta*, 458 U.S. 141, 153–54 (1982) ("[f]ederal regulations have no less pre-emptive effect than federal statutes" under the Supremacy Clause); *Hillsborough County, Fla.* v. *Automated Med. Labs*, 471 U.S. 707, 713 (1985) ("We have held repeatedly that state laws can be pre-empted by federal regulations as well as by federal statutes."). A federal agency may preempt state regulation whenever the agency, in doing so, is acting within the proper scope of its congressionally delegated authority. *Louisiana Public Serv. Comm'n* v. *FCC*, 476 U.S. 355, 368–69 (1986). *Accord City of New York*, 486 U.S. at 64 ("if the agency's choice to pre-empt 'represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned'" (citation omitted)). Thus, contrary to the commenters' suggestion, "[a] preemptive regulation's force does not depend on express congressional authorization to displace state law...." *Fidelity Federal Sav. & Loan Ass'n*, 458 U.S. at 154.

In promulgating this regulation, the Department is acting within the scope of its discretionary authority. The ample consideration given to this regulation and its earlier versions reflects the Department's effort reasonably to accommodate the relevant policies concerning law enforcement and professional conduct, and, as discussed in the previous section, there is no basis for concluding that the Department has exceeded its statutory authority. Moreover, the purpose of these rules, as defined in section 77.1, is to "ensure the Department's ability to enforce federal law effectively and ethically" and so fulfill the Department's statutory responsibilities. *See Capital Cities Cable, Inc.* v. *Crisp*, 467 U.S. 691, 700 (1984) (authority to regulate extends to all regulatory actions necessary to ensure the achievement of statutory responsibilities).

The "presumption against finding preemption of state law in areas traditionally regulated by the States," *California* v. *ARC America Corp.*, 490 U.S. 93, 101 (1989), and the traditional state regulation of legal practice and lawyers' ethics, *Leis* v. *Flynt*, 439 U.S. 438, 442 (1979), does not foreclose the Attorney General from concluding that it is appropriate here to displace those state rules that regulate the conduct of federal officials in the performance of their law enforcement duties. Here, the presumption against preemption is overcome by this regulation's express preemption provision, which is fully effective even in matters traditionally occupied by the states.

Furthermore, under the intergovernmental immunity doctrine, states may not directly regulate or punish federal officials for acts undertaken in their official capacities, or otherwise substantially interfere with the lawful functions of federal officials. *See, e.g., Hancock v. Train,* 426 U.S. 167, 178–79 (1976); *M'Culloch v. Maryland,* 17 U.S. (4 Wheat) 316, 437 (1819); Ethical Restraints of the ABA Code of Professional Responsibility on Federal Criminal Investigations, 4B Op. O.L.C. 576, 601–02 (1980). "An officer of the United States cannot, in the discharge of his duty, be governed and controlled by state laws, any further than such laws have been adopted and sanctioned by the legislative authority of the United States." *Bank of the United States v. Halstead,* 23 U.S. (10 Wheat.) 51, 63 (1825). Contacts covered by this regulation fall within the scope of federal attorneys' duties to carry out the law enforcement activities of the United States. The application to those attorneys of state ethics laws prohibiting such conduct therefore would constitute interference with the activities of the federal government forbidden by the intergovernmental immunity doctrine.

For the foregoing and other reasons, the Department believes that this regulation effectively preempts state ethical rules regarding contacts with represented persons.

3. *The Department's Authority to Supersede Federal District Court Rules.* Most federal district courts have adopted as local federal district court rules one of the two sets of ABA rules or a similar anti-contact rule of the state in which the district court sits. *See Rand v. Monsanto Co.,* 926 F.2d 596, 601–603 (7th Cir. 1991). Such adoption gives the state rules the force of federal law. *See United States v. Hvass,* 355 U.S. 570, 575 (1958). One individual and two organizations commented that this regulation, if promulgated, would abrogate the primary authority of federal courts to regulate the conduct of attorneys arising out of federal law enforcement proceedings.

The Department views this concern as significant but essentially theoretical, because the regulation has been crafted so that it will not operate in a way that puts it into conflict with local district court rules. However, in response to these comments, it should be noted that through this regulation the Department does intend not only to preempt the application by state courts of state rules relating to contacts by attorneys for the government, but also to supersede the application by federal courts of the local federal district court rules relating to contacts by government attorneys in civil and criminal law enforcement investigations and proceedings. *See* § 77.12 and accompanying commentary.

There are two reasons why the promulgation and operation of this regulation is unlikely to present the issue of abrogation of federal court authority identified by these commenters. The first is that the regulation adopts the line of analysis adopted by the great weight of authority interpreting local district court rules governing contacts with represented persons. *See United States v. Ryans,* 903 F.2d 731, 739 (10th Cir.) (discussing cases), *cert. denied,* 498 U.S. 855 (1990). The Department has not sought in this regulation to validate conduct that would otherwise be invalid under most local district court rules.

In addition, nearly all district courts that have adopted local rules governing contacts with represented persons have incorporated the "authorized by law" exception in the Model Rules or in the corresponding state rule. *See generally Rand,* 926 F.2d at 601–603. As explained above, this regulation constitutes "law" within the meaning of any such exception. Thus, the conduct this regulation authorizes is for that reason equally authorized by these local district court rules.

Thus, this regulation in practice should not present any tension between the federal executive and judicial powers. In response to the commenters' suggestion that any tension would have to be resolved in favor of the judicial power, however, the Department disagrees. Were the issue to arise, it would be properly considered, as an initial matter, as a question of the proper exercise of delegated legislative authority. Congress, not the courts, has the primary power to prescribe rules for the federal courts. *See Palermo v. United States,* 360 U.S. 343, 353 n. 11 (1959); *Sibbach v. Wilson & Co.,* 312 U.S. 1, 9–10 (1941). *See generally Hanna v. Plumer,* 380 U.S. 460, 472–73 (1965). In the case of this regulation, Congress has delegated that authority by statute to the Attorney General. This regulation therefore has no less legal force than, for example, the Federal Rules, which derive their ultimate authority from legislation. *See* 28 U.S.C. §§ 2071 *et seq.* Local district court rules, even those dealing with attorney discipline, may not displace legislatively-authorized national rules of procedure. *Rand,* 926 F.2d at 600 (Rules of Civil Procedure). *Accord, Baylson v. Disciplinary Bd. of Supreme Court of Pa.,* 975 F.2d 102, 107 (3d Cir. 1992) (Rules of Criminal Procedure). A local rule inconsistent with a regulation lawfully issued under statutory authority is, as a matter of law, inconsistent with the underlying statute, and must yield to Congress's paramount authority as delegated to the department or agency issuing the regulation. Thus, the conclusion that the Attorney General has the statutory authority to promulgate the proposed regulation entails the further conclusion that the regulation displaces inconsistent local federal court rules.

Furthermore, the regulation has been carefully drawn in such a way so that once a person has been brought before a court, in general no substantive communication can occur without the consent of counsel unless: the court finds a knowing, intelligent, and voluntary waiver; the communication is made pursuant to court-approved discovery procedures; or the communication concerns a criminal or civil offense different from the offense before the court. The regulation thus accords substantial and appropriate deference to the court's supervisory authority over the parties and proceedings before it. Moreover, this regulation does not purport to disturb the authority of federal courts to fashion appropriate remedies when an *ex parte* contact violates the Constitution. *See* § 77.11(b) and accompanying commentary. Therefore, federal courts will retain significant powers under the Constitution to respond to or sanction improper *ex parte* contacts by government attorneys with represented parties.

The balance of the regulation regulates contacts with persons who are not before the court, and as to whom the supervisory authority of a federal court is, at best, attenuated. *See, e.g., United States v. Payner,* 447 U.S. 727, 735 n. 7 (1980) ("The supervisory power merely permits federal courts to supervise the administration of criminal justice among the parties before the bar."); *United States v. Williams,* 112 S. Ct. 1735, 1742 (1992) (federal court has no "supervisory" judicial authority to prescribe standards of prosecutorial conduct before the grand jury in the first instance). It would raise significant separation of powers concerns for a district court to assert supervisory authority to regulate and sanction the conduct of executive branch attorneys when the Attorney General has adjudged such conduct legitimate and necessary for law enforcement purposes, when that judgment has been embodied in a duly promulgated regulation, and when the conduct concerns persons who have not yet come before the court.

C. *Sufficiency of Internal Enforcement Mechanisms.* Four organizations and two individuals commented that these

rules, as proposed, lacked enforcement mechanisms sufficient to deter prohibited communications. These comments took two forms: (1) a general suggestion that the Department could not be trusted to police itself (or as, one commenter put it, it would be a case of "the fox maintain[ing] . . . guard over the hen-house"); and (2) a specific concern that the restrictions to be placed in the United States Attorneys' Manual would not in fact be enforced against Department attorneys who violated them.

The Attorney General has exclusive authority over any violations of these rules. As a general matter, violations of these rules will be addressed as matters of attorney discipline by the Department, rather than by any external disciplinary authority. Only if the Attorney General finds a willful violation of these rules may sanctions for the violations be imposed by a state disciplinary authority. This disciplinary structure reflects the Department's belief that allowing sanctions to be issued independent of the Department's internal review process would frustrate the Department's efforts to eliminate the current uncertainty arising from the differing interpretations of the various anti-contact rules by federal courts, state courts, and state disciplinary authorities. The Department intends fully to enforce these rules and to issue appropriate and strong sanctions for any violation of these rules.

The Department also disagrees with those comments that suggest that the provisions the Department currently intends to add to the United States Attorneys' Manual will not be enforced. The Manual contains a great number of significant Department of Justice policies, many of which impose substantial restrictions on Department attorneys. There is no evidence that such policies are routinely overlooked by Department attorneys or that violations of policies set forth in the Manual are not regarded by the Department as serious breaches of professional duties. On the contrary, the failure to follow such policies is taken very seriously. The Department expects its attorneys involved in criminal or civil law enforcement to follow all provisions in the Manual amendments that it intends to issue regarding *ex parte* contacts. Failure to follow such rules will result in appropriate discipline by the Department.

### V. Section-by-Section Analysis

*Section 77.1: Purpose and Authority*

Comments relating to this section are addressed in the "General Comments" section above. No changes have been made to this section.

*Section 77.2: Definitions*

The following terms are defined in section 77.2 of this part. In the final rule, unlike in the proposed rule, these terms are arranged alphabetically for the reader's ease.

a. *"Attorney for the government."* The term "attorney for the government" includes virtually all Department of Justice attorneys with investigative, litigative, or management responsibilities, regardless of title. It does not, however, include law enforcement agents employed by the Department of Justice who are also members of state bars, if they are employed as, and are performing the function of, agents rather than attorneys. The Federal Bureau of Investigation, Drug Enforcement Agency and other investigative agencies have long recruited individuals with advanced degrees—including, for example, engineering, business, and law degrees—to serve as agents. The Department strongly encourages the recruitment of educated and specially-trained individuals for positions as agents. An agent's bar membership should not adversely affect his or her ability to conduct comprehensive investigations and otherwise to fulfill his or her law enforcement functions. Therefore, the rule specifically exempts attorney-agents from its scope if they are employed by the government as investigative agents and not as attorneys.

The term also does not include attorneys for departments or agencies outside the Department of Justice, regardless of their litigative authority, except to the extent such persons have been specially appointed pursuant to 28 U.S.C. 515 or 543.

Two Department of Justice components commented that the definition of "attorney for the government," which explicitly covers attorneys employed in the six main divisions of the Department, should be amended to cover all attorneys working in the legal offices of the various Department agencies, such as the Drug Enforcement Administration and the Federal Bureau of Investigation. The Department agrees that the definition of "attorney for the government" should not distinguish between attorneys employed in the Department's divisions and attorneys employed in the Department's agencies, given that both sets of attorneys exercise similar functions and responsibilities with respect to criminal investigations and prosecutions. Accordingly, the definition of "attorney for the government" has been modified to include explicitly "the Chief Counsel of the DEA and any attorney employed in that office, the General Counsel of the FBI and any attorney employed in that office or in the Legal Counsel Division of the FBI, and, in addition, any attorney employed in, or head of, any other legal office in a Department of Justice agency."

b. *"Civil Law Enforcement Investigation."* This term includes any investigation of potential civil violations of, or claims under, federal law that may form the basis of a civil law enforcement proceeding, as defined in paragraph 77.2(c).

c. *"Civil Law Enforcement Proceeding."* The term "civil law enforcement proceeding" encompasses a variety of activities beyond the particular areas identified in the definition, which are intended only to be illustrative.

The exclusion of proceedings related to the enforcement of an administrative subpoena or summons or a civil investigative demand (CID) is intended to ensure that the filing of such a proceeding does not trigger the limitations of section 77.5, which generally prohibits *ex parte* communications once adversary proceedings have commenced against a represented "party." Thus, the filing by the United States of a proceeding to enforce a subpoena, summons, or CID will not prohibit further investigatory communications regarding the underlying substantive violations.

The final sentence of paragraph 77.2(c)(2) ensures that the United States need not be the plaintiff in order for a civil action to be "brought by the United States," but may be a counterclaimant or cross-claimant if the counterclaim or cross-claim otherwise fits within the description of civil law enforcement.

d. *"Cooperating witness or individual."* A "cooperating witness or individual" is defined to include informants, witnesses, and other persons who are not law enforcement agents, but only to the extent that such a person is acting "to assist the government in an undercover or confidential capacity."

e. *"Employee."* The term "employee" is not limited to its literal meaning, but also includes officers, directors, partners, members, and trustees. See § 77.10 (communications involving organizations). An independent contractor would not be considered an "employee" for purposes of these rules.

f. *"Organization."* The term "organization" includes any corporation, partnership, association,

joint-stock company, union, trust, pension fund, unincorporated organization, state or local government or political subdivision thereof, or non-profit organization. It does not, of course, include groups of individuals "associated in fact" within the meaning of the racketeering statutes. *See* 18 U.S.C. 1961(4).

Communications with organizations and their employees are governed generally by section 77.10.

g. *"Person."* The term "person" includes individuals and organizations as defined in paragraph 77.2(f).

h. *"Undercover investigation."* Under this definition, the hallmark of an "undercover operation" is an investigation in which an individual "whose identity as an official of the government or a person acting at the behest thereof is concealed or is intended to be concealed." This definition is intended to be read broadly to include every type of law enforcement investigation in which the identity of a government employee, or the fact that an individual is cooperating with the government, is concealed.

*Section 77.3: Represented Party; Represented Person*

This section differentiates between a represented "party" and a represented "person." This distinction is fully consistent with the language of and principles underlying DR 7-104(a)(1) and Model Rule 4.2, which establish general prohibitions against *ex parte* contacts with a represented "party." Section 77.5 of this part generally prohibits government attorneys from initiating *ex parte* contacts with represented parties, but does not prohibit *ex parte* contacts with represented persons. (However, sections 77.8 and 77.9 also prohibit certain contacts with represented persons).

An individual is considered to be a "represented party" under paragraph 77.3(a) if: (1) the person is represented by counsel; (2) the representation is current *and* concerns the subject matter in question; *and* (3) the person has either been arrested or charged in a federal criminal case or is a defendant in a civil law enforcement proceeding concerning the subject matter of the representation. If the person is currently represented in fact regarding the subject matter in question, but has not been charged or arrested, that person is considered a "represented person." Thus, witnesses, suspects, and targets of investigations who have not been indicted or arrested, but are represented regarding the subject matter in question, are considered represented persons under this rule.

Several commenters argued that this section's basic distinction between represented "persons" and represented "parties" runs counter to the policy considerations underlying DR 7-104(A)(1) and Model Rule 4.2. However, as discussed in the "General Comments" section, this distinction is consistent with the vast majority of federal court opinions interpreting DR 7-104(A)(1) and Model Rule 4.2., as well as the text of those rules. Furthermore, this distinction is grounded in logic and common sense, given the legitimate necessity for attorneys for the government to be able to direct agents and cooperating witnesses to contact represented persons during undercover investigations.

One organization commented that prosecutors will hold back on filing formal charges in order to maximize their ability to communicate with represented "persons." The Department does not agree that prosecutors are likely to engage in this kind of systematic manipulation. The capacity to do so exists under the Sixth Amendment (given that the Sixth Amendment right to counsel attaches only once formal charges are filed, *see* Brewer v. *Williams*, 430 U.S. 387, 398 (1979)), but there is no evidence of systematic prosecutorial abuse of the charging process under the Sixth Amendment. Furthermore, the Department intends to add a new provision to the United States Attorneys' Manual that will prohibit a Department attorney from communicating overtly with a "target" of an investigation before he or she is formally charged or named as a civil defendant, except in specifically enumerated circumstances.

*Section 77.4: Constitutional and Other Limitations.*

This section makes clear that this regulation does not purport to authorize any communication prohibited by the Constitution or any federal statute or Federal Rule of Criminal or Civil Procedure. Although these rules do not supersede the Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure, this limitation does not extend to other rules regarding procedure in federal courts. Thus, rules of procedure adopted by individual courts as local rules, many of which incorporate state bar rules, are not included in this limitation; and, in fact, this regulation is explicitly intended to supersede local federal court rules regarding *ex parte* contacts by attorneys for the government. *See* § 77.12 and accompanying commentary.

No specific comments were received regarding this section, and it has not been changed.

*Section 77.5: General Rule for Civil and Criminal Enforcement; Represented Parties*

This section closely tracks the language of DR 7-104(A)(1) and Model Rule 4.2 and applies similar prohibitions to attorneys for the government. The section prohibits an attorney for the government from communicating with a represented party, as defined in section 77.3, about the subject matter of the representation without the consent of that individual's attorney. As with DR 7-104(A)(1) and Model Rule 4.2, the prohibition applies only if the attorney for the government knows that the represented party is, in fact, represented by counsel. Therefore, communications by an attorney for the government with a represented party will not violate this rule if the attorney for the government is unaware of the fact of representation.

This section also prohibits an attorney for the government from causing another individual to communicate with a represented party. Accordingly, this rule proscribes an attorney from directing a government investigator to do what the attorney himself or herself is prohibited from doing. Conversely, a government attorney will not be personally responsible for the actions of agents in communicating with represented persons unless, in doing so, the agents were acting as the attorney's "alter ego." *See United States* v. *Heinz*, 983 F.2d 609, 612-14 (5th Cir. 1993).

It also should be noted that this provision is violated (and thus, a basis for departmental discipline exists) when an inappropriate communication takes place, regardless of whether or not the communication results in eliciting an inculpatory statement or is otherwise prejudicial to the represented party.

No specific comments were received regarding this section, and it has not been changed.

*Section 77.6: Exceptions; Represented Parties*

This section describes the circumstances under which Department attorneys may communicate, or cause others to communicate, with a represented party whom the Department attorney knows is represented concerning the subject matter of the representation, without first obtaining the consent of the represented party's counsel.

*Paragraph (a): Determination if representation exists.*

This exception recognizes the fact that there is no reason to prohibit a limited inquiry about whether an individual is, in fact, represented by counsel regarding the relevant subject matter. Such an inquiry does not involve the kind of communication about which courts have expressed concern and has little potential for undermining the attorney-client relationship. It is also consistent with DR 7-104(A)(1) and Model Rule 4.2.

There may be uncertainty about the existence of representation with respect to whether it has been established, whether it may have been terminated, and whether a particular subject falls within the scope of the representation. The first issue typically arises before a judicial or other appearance, when the government attorney has some information suggesting that the person may be represented. It also may arise when an attorney purports to represent a group of persons, such as all the employees of a corporation. Uncertainty about the termination of the representation may arise when substantial time has passed since it was made known that the person was represented by counsel or when the attorney for the government has reason to believe that the representation has ceased. It is unlikely, however, that such uncertainty will arise when there are pending judicial proceedings, because in such circumstances the court in most jurisdictions must approve termination of representation.

In response to one comment, it is worth clarifying that that representation is presumed to cease to be current for purposes of these rules when the matter in question has reached a final judgment (i.e., once the direct appeals process, including any petition for certiorari, has run its full course), unless there is reason to believe that representation is continuing.

When inquiring about the status of representation, government attorneys and agents generally must refrain from stating whether it is necessary or desirable to be represented by counsel. After the right to counsel has attached, a statement or implication suggesting that counsel is not providing proper or effective representation could violate the Sixth Amendment right to effective assistance of counsel. *See United States v. Morrison*, 449 U.S. 361, 364 (1981).

One organization commented that the right to inquire whether a party is represented by counsel is an invitation to a more substantive conversation with a represented party with respect to the matter underlying the representation, which would violate these rules. The Department does not agree that this paragraph creates a significant potential for abuse. This exception, which is clear in its terms, allows Department attorneys to do no more than determine whether a person is in fact represented by counsel. The Department expects that all Department attorneys will understand the limited parameters and purpose of this exception, and any attempt to use this paragraph to gather additional information about the subject matter of the representation would be a clear violation of these rules and would constitute sanctionable conduct.

*Paragraph (b): Discovery or judicial or administrative process.*

Any communication that is authorized by discovery procedures, such as a deposition of a party-opponent, or by judicial or administrative process, such as a grand jury, deposition, or trial subpoena or an administrative summons, obviously should not be prohibited by any rule. *See United States v. Schwimmer*, 882 F.2d 22, 28 (2d Cir. 1989), *cert. denied*, 493 U.S. 1071 (1990) (prosecutor's questioning of represented person before the grand jury outside the presence of counsel is "authorized by law" under DR 7-104). Among other reasons for this exception, a person who is served with process has an opportunity to consult with counsel prior to his or her appearance at the proceeding, and may have counsel present if desired during the proceeding (except, of course, while testifying before a grand jury). More generally, communications authorized by discovery procedures already have in place appropriate mechanisms for protection of the attorney-client relationship. This provision ensures that this regulation does not prevent such communications from continuing to be allowed.

This exception does not purport to authorize any communications not otherwise available pursuant to approved discovery procedures or legal process. However, one individual commented that the text of paragraph (b), as proposed in March 1994, might be construed to authorize certain discovery procedures—such as the taking of a party's deposition testimony in the absence of the party's attorney and without the attorney's prior agreement—even where such practice was not in accordance with the rules of the applicable tribunal. To clarify that this paragraph's intent is to authorize only approved discovery procedures or legal process, this paragraph has been amended in the final rule to exempt only those communications made pursuant to discovery procedures or legal process "in accordance with the orders or rules of the court or other tribunal where the matter is pending."

*Paragraph (c): Initiation of communication by represented party.*

This paragraph sets out the circumstances under which it is proper for a government attorney to communicate with a represented party who has initiated contact, without the consent of that party's counsel.

A defendant may wish to communicate with the government outside the presence of counsel for many valid reasons. For instance, a defendant may wish to cooperate with the government but not want his or her attorney to know for fear that the attorney will disclose the defendant's intentions to others. This situation may arise, for example, when the defendant's attorney is being paid by another individual involved in a criminal enterprise, and the defendant questions whether he or she has the attorney's undivided loyalty. The same problem may arise when a single attorney represents multiple parties who are part of the same criminal enterprise.

When the desire of a defendant or arrestee to speak with the attorney for the government outside the presence of his or her counsel is "voluntary, knowing, and informed," there is no valid reason to prohibit the government from engaging in such communications. In fact, the Department believes that it would be a dereliction of its obligation vigorously to enforce federal law if it promulgated a rule that would prohibit such communications.

It is well established that an individual who is entitled to counsel under the Fifth Amendment or the Sixth Amendment may waive that right and choose to communicate with the government outside the presence of his or her attorney, "provided the waiver is made voluntarily, knowingly and intelligently." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (internal quotations omitted); *Patterson v. Illinois*, 487 U.S. 285, 292 (1988); *Brewer v. Williams*, 430 U.S. 387, 404-06 (1977). In such a situation, the defendant should not be prohibited from engaging in communications that are allowed by the Constitution by a disciplinary rule that was intended to protect that individual in the first place. Neither common sense nor the principles underlying DR 7-104 and Rule 4.2 requires such a result.

This paragraph includes procedural protections designed to ensure that such waivers are in fact voluntary, knowing, and informed. After a represented individual has been arrested or charged in a criminal proceeding or is named as a defendant in a civil law enforcement proceeding, this paragraph requires that

**Attachment B - page 11 of 16**

several steps be taken before a government attorney may engage in a substantive discussion with the represented party. First, the government attorney must inform the individual of his or her right to speak through his or her attorney and to have that attorney present for any communications with the government attorney. Second, the represented party must manifest his or her desire to waive the right to counsel in a voluntary, knowing, and informed way. If at all possible, the attorney for the government should obtain a signed written waiver. Third, the attorney for the government must bring the matter before the appropriate district court judge, magistrate judge, or other tribunal of competent jurisdiction. Then, it is up to the court to determine that the waiver satisfies the provisions of this rule or that substitute counsel is in place (including counsel appointed at that time by the court) who has consented to the communication.

This paragraph does not require, however, that the waiver must always take place before the judge or magistrate judge. In exceptional circumstances, it may be impractical or unsafe to bring the defendant before a judge or magistrate judge to secure the waiver. In such circumstances, the government attorney may secure a waiver from the defendant outside the court, and, before any substantive discussion between the defendant and the government takes place, bring evidence of the waiver to the court so that the court can determine whether the waiver was made knowingly, intelligently, and voluntarily.

One United States Attorney's Office commented that paragraph (c), as proposed, appeared to require an attorney first to obtain an informed waiver and only after receiving such a waiver to bring the matter before the appropriate tribunal. The Department does not intend to require (and does not understand the text of paragraph (c) to require) an attorney for the government, when contacted by a represented party, necessarily to attempt to secure a waiver himself or herself before bringing the matter to the attention of the court. A government attorney who is contacted by a represented party may, consistent with this paragraph, choose to bring the matter directly to the attention of the court, assuming the represented party has manifested his or her desire to waive the right to counsel. The court then would determine whether the party wishes to waive the presence of counsel for the communication. In general, however, the usual practice is for the government attorney to obtain from the represented party a waiver before bringing the matter before the court.

As noted above, the initiation of *ex parte* contacts by represented parties frequently occurs in the context of the "fearful defendant" whose attorney has been chosen by a third party, often an individual above the defendant in the criminal hierarchy. Such a defendant may wish to cooperate with the government but may fear that his life or safety will be endangered if his attorney learns of the cooperation. Although the need for a mechanism by which a represented party can initiate contacts with the government is particularly acute in this context, paragraph (c) is not limited to this setting. Rather, the proper inquiry is whether the represented party's waiver of the right to counsel is voluntary, knowing, and informed, not whether the represented party has established some overriding justification for his or her decision.

One organization objected to the extension of this exception to anyone other than a "fearful defendant," suggesting that any other client will have no better reason to initiate communication than "a misguided belief that he can help himself by talking to the prosecutor." The Department believes that it would be overly paternalistic to refuse to permit any but fearful represented parties to initiate direct contact with the government. Given that a criminal defendant has a constitutional right to decline legal representation entirely, *see Faretta v. California*, 422 U.S. 806 (1975), government attorneys should not be ethically bound to refuse to listen to a criminal defendant who chooses to decline the presence of counsel for purposes of a particular communication with appropriate court approval.

Additionally, it would be neither workable nor proper to require a Department attorney or judicial officer to probe the client about his or her relationship with counsel in order to ascertain whether the client is genuinely fearful, or fearful enough, of his or her attorney's involvement to justify a conversation outside the presence of counsel. Such an inquiry would tend to enhance, not minimize, intrusion into the attorney-client relationship. A more reliable protection of the client's interest and of the attorney-client relationship is this paragraph's careful process of testing the client's desire (as opposed to the client's reasons) for waiving the presence of counsel. This is the same analysis the courts undertake in assessing waivers of the constitutional rights to counsel or against self-incrimination. The proper issue in such a setting, as here, is whether the waiver is knowing, intelligent, and voluntary.

Another commenter opined that paragraph (c), by allowing represented parties to waive the presence of counsel and speak directly to a government attorney, would authorize a violation of the represented party's constitutional rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny. Cases following *Miranda* provide that custodial interrogation must cease whenever the person in custody invokes his or her right to have counsel present. *See, e.g., Edwards v. Arizona*, 451 U.S. 477 (1981). However, the prohibition against further interrogation does not apply when the accused himself or herself initiates further communication, *see id.* at 484–86, which would need to be the case for this paragraph to apply.

*Paragraph (d): Waivers at the time of arrest.*

The previous paragraph (paragraph (c)) provides the general guidelines regarding how a represented party may waive protections otherwise provided under this regulation. This paragraph provides for a different rule dealing specifically with a waiver at the time of arrest.

This paragraph provides that a government attorney may communicate directly with a represented party "at the time of arrest of the represented party" without the consent of that party's counsel, provided that the represented party has been fully informed of his or her constitutional rights at that time and has waived them. The government attorney need not comply with any of the additional requirements of paragraph (c) in such a situation.

A substantial body of law has developed regarding waiver of constitutional rights in the immediate post-arrest setting. The Department believes that the constitutional protections established in that decisional law adequately protect represented individuals following arrest. Furthermore, the effectiveness of post-arrest interviews would be significantly curtailed if the procedural requirements of paragraph (c) applied. Accordingly, this paragraph is intended to preserve this investigative tool without adding any additional procedural requirements.

The Department received two comments regarding this paragraph: one relating to the timing of the waiver, and the other relating to the terms of the waiver.

A Department component commented that it would clarify the meaning of a communication "at the time of the arrest of the represented person" to add to the text that such communication must be

made "at the time of the arrest of the represented party before he or she is presented to a judicial officer with respect to that arrest . . . ." The Department has decided against adopting the proposed additional language, because it would unadvisedly extend this exception beyond its proper and intended narrow limits. This exception to the general rule against post-arrest communications is designed to preserve the ability of government attorneys to interview individuals immediately (i.e., within hours) following arrest as an effective and important law enforcement tool. *See, e.g.*, 18 U.S.C. 3501(c). It is not intended to allow government attorneys to attempt to initiate communications with an arrested person any time before the person is presented to a judicial officer, which can extend days beyond the "time of arrest." The Department believes that such an extension of this limited exception could put excessive pressure on clients and unduly intrude upon the attorney-client relationship.

A United States Attorney's Office commented that proposed paragraph (d), under which the represented party must be advised of and waive "his or her constitutional rights," could be construed to require the represented party to be explicitly told that he or she has a right to *his* or *her* attorney, and not just that he or she has a right to *an* attorney (as required by *Miranda* v. *Arizona*, 384 U.S. 436 (1966)). This paragraph is intended to apply whenever an arrested person is read his or her *Miranda* rights and waives those rights; it is not intended to require the represented party to be apprised of his right to counsel in any different or more specific terms than *Miranda* and its progeny require. To make clear that the usual *Miranda* warnings and waiver suffice for purposes of this section, paragraph 77.6(d) has been amended in the final rule to read as follows: "The communication is made at the time of the arrest of the represented party and he or she is advised of his or her rights under *Miranda* v. *Arizona*, 384 U.S. 436 (1966), and voluntarily and knowingly waives them."

*Paragraph (e): Investigation of additional, different, or ongoing crimes or civil violations.*

The Sixth Amendment right to counsel is "offense-specific." *McNeil* v. *Wisconsin*, 111 S. Ct. 2204, 2207 (1991). Thus, a defendant whose Sixth Amendment rights have attached as to one offense remains subject to questioning, whether direct or covert, regarding uncharged crimes. *Id.*; *Maine* v. *Moulton*, 474 U.S. 159, 180 n.16 (1985); *United States* v. *Mitcheltree*, 940 F.2d 1329, 1342 (10th Cir. 1991); *United States* v. *Terzado-Madruga*, 897 F.2d 1099, 1111–12 (11th Cir. 1990); *United States* v. *Chu*, 779 F.2d 356, 368 (7th Cir. 1985); *United States* v. *Grego*, 724 F.2d 701, 703 (8th Cir. 1984). The proposed rule employs an analogous approach, permitting *ex parte* contacts with a represented party if the contacts involve the investigation of offenses as to which the represented party has been neither arrested nor charged in a criminal or civil law enforcement proceeding. The Department believes this approach is wholly consistent with DR 7–104 and Model Rule 4.2 and the cases interpreting those rules.

Accordingly, this section provides that communications may be made in the course of investigations of additional, different, or ongoing criminal or unlawful activity, even though the individual is represented by counsel with respect to conduct for which he or she has already been arrested or charged. Such additional criminal or unlawful conduct is typically one of three varieties: (1) conduct that is separate from the original wrongful conduct; (2) crimes or unlawful conduct that are intended to impede the administration of justice or the trial of the charged crime, such as subornation of perjury, obstruction of justice, jury tampering, or murder, assault, or intimidation of witnesses; and (3) conduct that is a continuation of the charged crime, such as a conspiracy or a scheme to defraud that continues past the time of indictment. The new or additional criminal or wrongful activity may have occurred in the past or may be ongoing at the time of the investigation.

One organization objected to this section's coverage of criminal or wrongful activity that has already been completed at the time of the communication, as distinct from activity that is ongoing. However, the Department sees no basis in the policies underlying the Sixth Amendment and the Model Rules for basing the propriety of investigation into additional or different uncharged crimes on whether such activity is complete or ongoing.

One individual expressed concern that Department attorneys would exploit this exception by making gratuitous allusions to other offenses in the course of an otherwise illicit contact with a represented party. As noted above, prevailing case law interpreting the Sixth Amendment and the Model Rules permit an attorney to question a defendant as to uncharged offenses, and there is no evidence of systemic prosecutorial abuse of this type of interrogation. Accordingly, there is no reason to suspect that prosecutorial practice under these rules will be different.

*Paragraph (f): Threat to safety or life.*

The Supreme Court has recognized that, in certain limited situations, the need to guard against threats to public safety can justify noncompliance with otherwise applicable constitutional safeguards. *See Warden* v. *Hayden*, 387 U.S. 294, 298–99 (1967) (warrantless search permissible when delay would endanger lives of officers and citizens); *New York* v. *Quarles*, 467 U.S. 649, 657 (1984) ("the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the [*Miranda*] prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination"). This paragraph recognizes an analogous exception to the general prohibition against communications with represented parties in the absence of their counsel. It is the Department's intention that this exception be invoked only in rare circumstances and only for the purpose of protecting human life or safety.

The exception has three requirements: (1) the attorney for the government must have a good faith belief that the safety or life of any person is threatened; (2) the purpose of the communication must be to obtain information to protect against the risk of injury or death; and (3) the attorney for the government must, in good faith, believe that the communication is reasonably necessary to protect against such risk. These requirements are imposed to ensure that the exception is invoked only to protect human life or safety, and not as a routine matter in violent crime prosecutions. For example, the fact that potentially dangerous firearms have not been recovered would not in and of itself be sufficient under ordinary circumstances to constitute a threat to safety under this exception. Furthermore, the communication must be for the purpose of protecting human life or safety, and may not be designed to elicit testimonial evidence. However, information thus obtained may be used for any purpose consistent with constitutional limitations.

No specific comments were received regarding this paragraph, and it has not been changed.

*Section 77.7: Represented Persons; Investigations*

As noted in the discussion of section 77.3, individuals and organizations who are neither defendants nor arrestees are not "parties" within the meaning of this rule, and the general prohibition on *ex*

*parte* contacts therefore does not apply. This section makes clear that attorneys for the government are authorized to communicate, directly or indirectly, with a represented person unless the contact is prohibited by some other provision of federal law. These communications are subject, however, to the restrictions set forth in sections 77.8 and 77.9 regarding certain categories of negotiations and respect for attorney-client relationships.

Two individuals commented that this section, even as limited by sections 77.8 and 77.9, allows a broader range of contact with persons under investigation than is necessary to meet the Department's legitimate investigative needs. These individuals agreed that the government must be free to conduct undercover operations and investigations, even when field investigators coming into contact with potential criminal or civil respondents are directed by government attorneys. They argued, however, that overt communications with persons during the investigative stage are not similarly justified.

The Department agrees that overt communications between a government attorney and a represented person during the investigative stage raise different considerations from covert communications and should be subject to greater restrictions. For this reason, the Department plans to make revisions to the United States Attorneys' Manual providing that government attorneys should engage in overt communications only after carefully considering whether the communication is more appropriately handled by others, and should generally not communicate overtly, or cause another to communicate overtly, with a target of a federal criminal or civil investigation, who is known by the Department attorney to be represented by counsel, concerning the subject matter of the representation. Nevertheless, the Department believes that overt contacts by federal attorneys and agents with witnesses and subjects of investigations are often necessary for effective law enforcement and hence should be permitted.

*Section 77.8: Represented Persons and Represented Parties; Plea Negotiations and Other Legal Agreements*

This section prohibits government attorneys from initiating or engaging in negotiations of certain specified legal agreements with any individual whom the government attorney knows is represented by counsel, without the counsel's consent. Even when the regulation otherwise permits substantive discussions with a represented party or represented person, it ordinarily would be improper for a government attorney to initiate or negotiate a plea agreement, settlement, immunity agreement or any other disposition of a claim or charge without the consent of the individual's counsel. The one exception to this prohibition occurs when the communication is initiated by the represented person or represented party and the procedural safeguards provided for in paragraph 77.6(c) are satisfied.

The Department believes that this section is important for the preservation of the attorney-client relationship. One of the primary purposes of DR 7-104 and Model Rule 4.2 is to protect an individual represented by counsel from overreaching by an attorney for an adversary. The Department believes the risk and the consequences of such overreaching are at their greatest during negotiations over plea agreements, settlements, and other key legal agreements. The training, experience, and knowledge of the law possessed by an attorney is particularly valuable in such situations.

The prohibition contained in this section includes all negotiations of the terms of a particular plea agreement, settlement agreement, or other agreement covered by the section. However, this section does not prohibit an attorney for the government from responding to questions regarding the nature of such agreements, potential charges, potential penalties, or other subjects related to such agreements during an otherwise permissible discussion. Nevertheless, an attorney for the government should take care in such situations not to go beyond providing information on these and similar subjects and should generally refer the represented person to his or her counsel for further discussion of these issues. The government attorney should also make it clear that he or she will not negotiate any agreement with respect to the disposition of criminal charges, civil claims or potential charges, or immunity agreements without the consent of counsel.

No specific comments were received regarding this section, and it has not been changed.

*Section 77.9: Represented Persons and Represented Parties; Respect for Attorney-Client Relationships*

When an attorney for the government communicates with a represented party pursuant to one or more of the exceptions listed in section 77.6, or with a represented person pursuant to section 77.7, the communication is nevertheless subject to the restrictions of this section.

*Paragraph (a): Deference to Attorney-Client Relationship*

Federal courts have recognized that it is improper for an attorney for the government to disparage counsel for the represented party or otherwise to seek to disrupt the relationship between that party and his attorney. *See, e.g., United States v. Morrison*, 449 U.S. 361, 362, 367 (1981); *United States v. Weiss*, 599 F.2d 730, 740 (5th Cir. 1979); *id.* at 740–41 (Godbold, J., specially concurring). This paragraph codifies those basic principles by prohibiting communications that: (1) attempt to elicit information regarding lawful defense strategies; (2) disparage the represented party's counsel; or (3) otherwise improperly seek to disrupt the attorney-client relationship. These prohibitions apply in every phase of criminal and civil enforcement investigations and proceedings.

However, the paragraph also accommodates an important exception to this prohibition. Courts have held that a government attorney may not permit legal proceedings to go forward if he or she is aware of a conflict of interest between a represented party and his or her lawyer. *See United States v. Iorizzo*, 786 F.2d 52, 59 (2d Cir. 1986). Under this circumstance, the attorney for the government ordinarily should move to disqualify the lawyer involved, if legal proceedings have already commenced. If it is not feasible to move for disqualification or otherwise challenge the representation, this paragraph allows an attorney for the government to communicate with the represented individual for the limited purpose of apprising the represented individual of the perceived conflict. However, any substantive discussion of the subject matter of the representation is permissible only insofar as it is authorized by some other provision of this rule.

In order to ensure that this provision is used only in rare circumstances, the rule requires prior authorization for such communications from the Attorney General, the Deputy Attorney General, the Associate Attorney General, an Assistant Attorney General or a United States Attorney. The authorization should be in writing if at all possible. Furthermore, before providing approval, the authorizing officer must find: (1) a substantial likelihood of a conflict; and (2) that it is not feasible to obtain a court order on the matter.

One organization commented that judicial approval, or at least approval by a designated Assistant Attorney General

**Attachment B - page 14 of 16**

(rather than by a United States Attorney), should be required before an attorney for the government may apprise a represented party or person of any perceived conflict of interest. Another organization and an individual commented that attorneys for the government should never be allowed to inform a represented individual of a perceived conflict of interest, and, instead, should be required to move to disqualify counsel and leave it to the court to adjudicate any conflicts of interest. The Department believes that there will be circumstances in which it will not be feasible to obtain a judicial order challenging the representation (especially prior to the filing of charges), or when the exigencies of the situation may make it impracticable to obtain prior authorization of a judicial officer or an Assistant Attorney General. In such circumstances, and when a high-level Department official, such as a United States Attorney, determines that there is a significant likelihood of a conflict of interest between a represented individual and his or her attorney, it is better that the represented person or party be apprised of the potential conflict of interest than be left uninformed. Accordingly, the Department has decided to leave this paragraph unchanged in the final rule.

*Paragraph (b): Attorney-Client Meetings*

The attendance of an undercover agent or a cooperating witness at lawful meetings of an individual and his or her attorneys is ordinarily an improper intrusion into the attorney-client relationship. The courts have recognized, however, that such attendance occasionally will be required when the operative is invited to participate and his or her refusal to do so would effectively reveal his or her connection to the government. *See, e.g., Weatherford* v. *Bursey,* 429 U.S. 545, 557 (1977); *United States* v. *Ginsberg,* 758 F.2d 823, 833 (2d Cir. 1985); *United States* v. *Mastroianni,* 749 F.2d 900, 906 (1st Cir. 1984). As the First Circuit has noted, a contrary rule "would provide the defense with a quick and easy alarm system to detect the presence of any informants, simply by inviting all known associates of defendants to a supposed defense strategy meeting." *Mastroianni,* 749 F.2d at 906.

Attendance at such meetings, however, intrudes into the attorney-client relationship and impairs the right of the defendant to a fair trial. Accordingly, this section provides that undercover agents or cooperating witnesses may participate in such meetings, but only when requested to do so by the defense and when reasonably necessary to protect their safety or life or the confidentiality of an undercover operation. *See Weatherford,* 429 U.S. at 557.

However, even when an undercover operative's attendance at such a lawful meeting is authorized to protect his or her cover and safety, any information acquired regarding lawful defense strategy or trial preparation may not be communicated to government attorneys or otherwise used to the substantial detriment of the represented party. *See Weatherford,* 429 U.S. at 558; *Ginsberg,* 758 F.2d at 833; *Mastroianni,* 749 F.2d at 906. As a safeguard, this rule provides that such information should not be communicated to the attorneys for the government or law enforcement agents who are participating in the trial of the pending criminal charges.

When there is reasonable cause to believe that the purpose of the meeting is not the lawful defense of the underlying charges, but the commission of a new or additional crime (such as bribery of a witness or subordination of perjury), attendance by informants or undercover agents at attorney-client meetings is permissible pursuant to paragraph 77.6(e). The belief, however, must be based on reasonable cause, not mere suspicion or conjecture. *See Mastroianni,* 749 F.2d at 906. Furthermore, the prohibition against communication of lawful defense strategy to the prosecution should be observed if, in fact, such strategy is imparted to the informant or agent.

Government attorneys should give serious consideration to the extreme sensitivity of permitting agent and informant attendance at defense meetings. Agents and informants should be instructed to avoid participating in such meetings, and to minimize their participation when attendance is required, if it is possible to do so without arousing suspicion. Agents or witnesses who attend defense meetings should also be instructed to make every attempt to avoid taking any role in the shaping of defense strategy or trial preparations. Additionally, agents and informants should be instructed to avoid imparting lawful defense strategy or trial preparation information to attorneys for the government or to law enforcement agents who are directly participating in the ongoing investigation or in the prosecution of pending criminal charges.

Finally, this restriction applies only to law enforcement officials and cooperating witnesses who are acting as "agents for the government" at the time of the communication. If one of several co-defendants who attended an attorney-client defense strategy meeting later testifies for the government at trial, no violation will have occurred as long as the co-defendant was not a government agent at the time of the meeting. *United States* v. *Brugman,* 655 F.2d 540, 545–46 (4th Cir. 1981).

A Department component commented that an undercover agent's attendance at a meeting at which legal strategy is not discussed does not intrude on the attorney-client relationship; therefore, the component proposed limiting this paragraph's prohibition against government agents participating in an attorney-client meeting or communication to situations where there is a "reasonable basis" to believe that the meeting or communication will concern legal advice or strategy. The Department believes that it is unwise and unworkable to encourage government attorneys and undercover agents to guess whether legal issues will come up in an attorney-client meeting or communication. It would also be disruptive of the attorney-client relationship for government attorneys and undercover agents to gather the information that might make such a determination even remotely reliable. Therefore, this paragraph has not been changed.

*Section 77.10: Organizations and Employees*

This section addresses the difficult issue of when a communication with an employee or member of a represented organization should be considered a communication with the organization itself. Important interests depend on this determination. On the one hand, organizations should not be shielded from effective criminal or civil law enforcement prosecution simply by retaining counsel. It is not uncommon for federal prosecutors to encounter attorneys who assert that they represent every individual in a large corporation or organization. If such attorneys were able to prevent government investigators from gaining informal access to any employee of the organization by withholding consent, information relevant to claims against the organization might never come to light because such information is often in the exclusive possession of the organization and its employees. *See, e.g., Suggs* v. *Capital Cities/ABC Inc.,* 54 Empl. Prac. Dec. (CCH) ¶ 40,195 at 63,910 (S.D.N.Y. Apr. 24, 1990). On the other hand, organizations are entitled to the effective assistance of counsel, and the relationship between an organization and its counsel deserves respect.

The Department believes that this section, and particularly the definition of "controlling individual" in paragraph

**Attachment B - page 15 of 16**

(a) of this section, strikes an appropriate balance, one that ensures government attorneys the ability to enforce federal law, while preserving the opportunity for corporations and other organizations to secure effective assistance of counsel.

*Paragraph (a): Communications with current employees; organizational representation.*

This paragraph states that a communication with a current employee of an organizational party or person should be treated as a communication with the organization for purposes of this part only if the employee is a "controlling individual." If a communication with a current employee is properly characterized under this regulation as a communication with a represented organization (that is, if the communication is with a controlling individual), then that communication is subject generally to the same limitations that would apply if the communication were with a represented person or represented party.

In accord with the basic structure of this regulation, which distinguishes between represented parties and represented persons, this paragraph effectively provides that when an organization is a represented party, an attorney for the government shall not communicate, or cause another to communicate, with any controlling individual of the organization without the consent of the organization's attorney, subject to the exceptions enumerated in § 77.6. In contrast, when an organization qualifies as a represented person, an attorney for the government may communicate, or cause another to communicate, with any controlling individual, provided the communication does not violate the provisions of §§ 77.8 or 77.9.

The definition of "controlling individual" is intended to encompass those individuals who typically are part of the organization's control group. A controlling individual under this definition must: (1) be a current employee or member of the organization; (2) hold a high-level position with the organization; (3) participate "as a decision maker in the determination of the organization's legal position in the proceeding or investigation of the subject matter;" and (4) be known by the government to be engaged in such activities. This definition attempts to identify those limited number of individuals affiliated with the organization who actually are involved in determining the organization's position with regard to the legal proceeding or investigation.

One individual and one organization questioned limiting the class of employees who should be considered "controlling individuals" for purposes of this subsection to those who participate in framing the organization's legal position in the matter. They argued that the proposed "controlling individual" test authorizes contacts with employees who, while not directing the organization's counsel, nonetheless have extensive authority to act on behalf of the organization. The underlying concern of these comments appears to be that this paragraph, as proposed, authorizes contacts with many employees who are likely to possess information relevant to claims asserted against the corporation and who have the capacity to make statements that a court will deem admissible at trial as evidentiary admissions against the corporation. This is certainly true. However, the Department believes that its anti-contact rule should not be designed with the goal of protecting corporations from disclosure of prejudicial facts. *See, e.g., Action Air Freight v. Pilot Air Freight,* 769 F. Supp. 899, 903 (E.D. Pa. 1991) (anti-contact rule "should not necessarily chill the flow of harmful information"); *Hanntz v. Shiley, Inc.,* 766 F. Supp. 258, 267 (D.N.J. 1991) ("the policies of Rule 4.2 do not justify a wholesale restriction on discovery of factual information, damaging or not").

Anti-contact rules such as DR 7-104 and Model Rule 4.2 are intended to protect the attorney-client relationship from unnecessary interference and to protect represented parties from overreaching by opposing counsel. Damage to the attorney-client relationship inheres particularly in communications with high-level corporate employees who have contact with the corporation's attorneys in the course of making ultimate decisions regarding choice of counsel, implementing counsel's advice, and determining settlement and other litigation strategies. Therefore, communications with those high-level individuals affiliated with or employed by an organization who are responsible for employing and directing the organization's counsel and for determining legal positions taken by the organization are the type of communications prohibited by DR 7-104.

Accordingly, this paragraph defines "controlling individual" consistently with the principles underlying the disciplinary rules on *ex parte* contacts. The Department also believes that the alternative approaches urged by commenters would impose unacceptable constraints on federal law enforcement. Therefore, this paragraph has not been changed.

*Paragraph (b): Communications with former employees; organizational representation.*

This paragraph authorizes communications with former employees of represented organizations. Because former employees do not direct the affairs of the organization and therefore cannot be considered members of the "control group" or any other controlling entity of an organization, communications with them are not considered communications with the organization for purposes of the rule. This reasoning is consistent with the conclusion of the majority of federal courts that have held that DR 7-104(A)(1) does not bar communications with former employees of a represented corporate party. *See, e.g., Hanntz v. Shiley, Inc.,* 766 F. Supp. 258, 267 & n.8 (D.N.J. 1991); *Action Air Freight, Inc. v. Pilot Air Freight Corp.,* 769 F. Supp. 899, 904 (E.D. Pa. 1991); *Shearson Lehman Bros., Inc. v. Wasatch Bank,* 139 F.R.D. 412, 417–18 (D. Utah 1991); *Sherrod v. Furniture Center,* 769 F. Supp. 1021, 1022 (W.D. Tenn. 1991); *Dubois v. Gradco Systems, Inc.,* 136 F.R.D. 341, 345 n.4 (D. Conn. 1991); *Polycast Technology Corp. v. Uniroyal, Inc.,* 129 F.R.D. 621, 628 (S.D.N.Y. 1990). *See also* ABA Comm. on Ethics and Professional Responsibility, Formal Op. 359 (1991) ("Accordingly, it is the opinion of the Committee that a lawyer representing a client in a matter adverse to a corporate party that is represented by another lawyer may, without violating Model Rule 4.2, communicate about the subject of the representation with an unrepresented former employee of the corporate party without the consent of the corporation's lawyer."). *But see PPG Industries, Inc. v. BASF Corp.,* 134 F.R.D. 118, 121 (W.D. Pa. 1990); *Public Serv. Elec. & Gas v. Associated Elec. & Gas,* 745 F. Supp. 1037, 1042 (D.N.J. 1990).

No specific comments were received regarding this paragraph, and it has not been changed.

*Paragraph (c): Communications With Former or Current Employees; Individual Representation*

This paragraph provides that if a former or current employee or a member of an organization retains his or her own counsel, the government shall provide the same protection to him or her that would be provided under this part to any other represented person or represented party. Communications with that individual are subject to the limitations set forth in this part. Although this paragraph provides the